# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| AMANDA HERNANDEZ, ) | |
| ) | No. 13 CV 1955 |
| Plaintiff, ) | |
| ) | |
| v. ) | Magistrate Judge Young B. Kim |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | September 25, 2014 |
| Defendant. ) | |

## MEMORANDUM OPINION and ORDER

Amanda Hernandez claims that she is disabled by a combination of depression, anxiety, and a learning disorder. In this suit Hernandez challenges a final decision by the Commissioner of the Social Security Administration denying her applications for disability insurance benefits ("DIB") and social security income ("SSI"), *see* 42 U.S.C. §§ 416(i), 423(d), 1381, *et seq*. Currently before the court are the parties' cross-motions for summary judgment. For the following reasons, Hernandez's motion is granted, the Commissioner's is denied, and the case is remanded for further proceedings:

## Procedural History

Hernandez filed her DIB and SSI applications in February 2010, claiming a disability onset date of January 1, 2005. (Administrative Record ("A.R.") 116-126.) After her claims were denied initially and upon reconsideration, (id. at 72-76), Hernandez requested and was granted a hearing before an administrative law judge ("ALJ"). Before that hearing took place, Hernandez amended her alleged

disability onset date to December 31, 2009. (Id. at 34-71, 248.) A month after the hearing, on December 22, 2011, the assigned ALJ denied Hernandez's applications for benefits. (Id. at 29.) The Appeals Council declined review, (id. at 5-7), making the ALJ's decision the final decision of the Commissioner, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). After seeking and receiving an extension of time to file a suit seeking judicial review of the Commissioner's final decision, (A.R. 1), Hernandez filed her federal complaint on March 13, 2013, *see* 42 U.S.C. § 405(g). The parties have consented to this court's jurisdiction. (R. 15); *see* 28 U.S.C. § 636(c).

**Facts**

Hernandez was just shy of her 25th birthday when she appeared before the ALJ to describe her struggles with chronic depression, anxiety, and a learning disability that negatively impacts her ability to read. She presented the ALJ with high school records documenting her reading deficits, attendance problems, and persistent behavior issues. (A.R. 265-67, 290-93.) Those records document her trouble following directions, controlling her temper, completing tasks, and accepting responsibility for her negative behavior. (Id.) At the hearing, Hernandez also presented medical records and her own testimony in support of her claims.

**A.  Medical Records**

Hernandez's medical records begin with a psychological report completed in January 2008 by clinical psychologist Linda Kuntner, Psy.D., who evaluated Hernandez on behalf of the Division of Rehabilitation Services. (A.R. 316-20.)

Dr. Kuntner described Hernandez as being neatly groomed and polite, but noted that she started crying when asked about her self-image and depression. (Id. at 317.) Dr. Kuntner's testing revealed that Hernandez reads at a grade equivalent of 1.6, which was indicative of "a severe reading disorder." (Id. at 317, 319.) She also found that Hernandez showed signs of depression and anxiety, especially in social situations. (Id. at 318.) In summarizing her conclusions, Dr. Kuntner noted that "Hernandez is a young woman of borderline intellectual abilities who has a severe learning disability which affects many aspects of her life including her ability to obtain and maintain employment." (Id. at 320.)

In April 2010 clinical psychologist Gregory Rudolph, Ph.D., evaluated Hernandez at the behest of the Bureau of Developmental Disabilities Services. (Id. at 321-24.) After examining Hernandez for 35 minutes Dr. Rudolph noted that she had a history of depression, anxiety, anxiety attacks, and vegetative symptoms. (Id. at 322-23.) In his opinion, Hernandez was able to use judgment and had an appropriate memory and affect, but was depressed with a subdued mood level. (Id. at 323.)

Three days later Hernandez underwent yet another psychological evaluation, this time with clinical psychologist Mary Alice Povolny, Ph.D. (Id. at 379-82.) During a round of cognitive testing, Dr. Povolny observed that Hernandez was working hard but started crying when the questions became difficult for her. (Id. at 381.) She recommended that Hernandez undergo a psychiatric evaluation to see if medication or therapy could help address her depression and self-esteem issues

3

stemming from her learning disability. (Id. at 382.) Dr. Povolny opined that Hernandez would need to "avoid jobs that require reading and comprehending." (Id.)

The following month, consultant Jerrold Heinrich, Ph.D., completed a psychiatric residual functional capacity ("RFC") assessment based on his review of Hernandez's medical file. (Id. at 330-47.) He acknowledged that Hernandez exhibits depression, anxiety disorder, and antisocial behavior, but concluded that those impairments cause only mild restrictions in her activities of daily living and social functioning, and moderate difficulties in her ability to maintain "concentration, persistence, or pace." (Id. at 333-37, 340.) In particular he checked boxes rating Hernandez as moderately limited in her ability to understand, remember, and carry out detailed instructions and in her ability to respond appropriately to workplace changes. (Id. at 344-45.)

From June 2010 through April 2011 Hernandez received treatment from Lisa Fields, a physician assistant. In her initial notes Fields observed that Hernandez was depressed, unable to cope, and experiencing suicidal thoughts. (Id. at 372.) Fields diagnosed her with major depression, and because Hernandez was pregnant at the time, Fields recommended she stop taking Prozac. (Id.) By March 2011 Hernandez was no longer pregnant but still feeling suicidal, so Fields restarted her Prozac prescription. (Id. at 373.) The following month Fields noted that her depression had improved, although she was still feeling tired, staying in her house, and engaging in less activity. (Id. at 374-75.)

4

In May 2011 Hernandez had an initial psychological assessment with psychiatrist Dr. Beth Fraum, who characterized her as "passively suicidal." (Id. at 359, 362.) Hernandez told her that she was so depressed she struggled to get out of bed, and spent a lot of time sleeping and crying. (Id. at 359.) She also reported that she had lost a temporary job because she often was too depressed to get out of bed and go to work. (Id. at 361.) Based on their initial conversation, Dr. Fraum referred Hernandez for in-patient treatment at a crisis care program. (Id. at 362.)

At the crisis care program Hernandez told her doctors that she was not able to function or take care of her children because she has no energy, cries easily, and sleeps all day. (Id. at 357.) She also was experiencing mood swings, anxiety, and difficulty concentrating and relaxing. (Id.) Hernandez was admitted for three nights in an attempt to stabilize her mood. (Id. at 365.) She was diagnosed with depression and bipolar disorder and discharged with prescriptions for Prozac, Abilify, and Clonazepam. (Id. at 364-65.)

Following her discharge from the crisis care program, Hernandez continued to receive treatment from Dr. Fraum, whose notes reflect that in June 2011 Hernandez needed medication because public aid would not pay for her Abilify prescription. (Id. at 356.) Hernandez was "doing poorly" off the drug, with symptoms including depressed mood, forgetfulness, and tearfulness. (Id.) She was back on Abilify by July 2011, and although she had fewer bad days while medicated, Dr. Fraum increased her prescription after noting that Hernandez still had two to three bad days per week. (Id. at 355.) In August Dr. Fraum observed that she

5

needed to increase Hernandez's Prozac prescription after she reported being anxious and counting in her mind "forever." (Id. at 377.) Hernandez told Dr. Fraum that "[e]ven as I talk to you I'm counting." (Id.) In her last treatment note dated October 2011, Dr. Fraum noted that Hernandez was counting less but had not stopped altogether, and that her mood was improved. (Id. at 376.)

**B.     Hernandez's Testimony**

During her hearing before the ALJ, Hernandez described the ways in which her depression and anxiety impact her daily life. Hernandez testified that she lives with her two small children and their father. (A.R. 42.) She last worked temporarily in a factory but was let go because she was missing two to three days of work each week, and even when she went to work, she would leave after only two hours or so. (Id. at 47.) She was fired for similar reasons from a job cleaning bathrooms at a fitness club. (Id. at 48.) Hernandez explained that her chronic absenteeism stemmed from her fatigue and persistent inability to get out of bed. (Id. at 48-49.) She said that she is so depressed that she often stays in bed for three to four days a week, and that she spends the majority of her day crying. (Id. at 49-50.) On a good day she is able to play with her children and give them attention, but on bad days she does not want to interact with anyone. (Id. at 57-58.) Hernandez said that her medication helped her go from having all bad days to having three to four bad days a week. (Id. at 59.)

Hernandez testified that she relies heavily on her sister to help her deal with the daily aspects of life. (Id. at 55-56.) Her sister helps take care of her children,

6

helps her with grocery shopping and picking up medications, and takes her children to the doctor. (Id.) According to Hernandez, she is unable to do those things because her chest gets heavy, she has difficulty breathing, and she starts sweating when she is around too many people. (Id. at 56.) She has these panic attacks on a daily basis. (Id.) Hernandez also has trouble performing household chores because she lacks the energy to finish tasks that she starts. (Id. at 57.) She does not watch TV because it sets off "all these different thoughts and stuff running through my head," and she does not engage in any social activities. (Id. at 58.)

**C.  Vocational Expert's Testimony**

Vocational expert ("VE") Craig Johnston also testified at the hearing, where he described Hernandez's past relevant work as a porter, a production assembler, and a dishwasher. (A.R. 63.) The ALJ asked whether any of those jobs would be available to a hypothetical person of Hernandez's age, educational background, and work experience who has no physical limitations but who is limited to simple, routine, and repetitive tasks in an environment free of fast-paced production requirements. (Id. at 63-64.) The proposed person could only engage in simple decision-making with few changes in the work setting and only occasional contact with supervisors, co-workers, or the public. (Id. at 64.) The ALJ also asked the VE to limit the hypothetical person to no reading at any level higher than first grade. (Id.) The VE testified that the proposed hypothetical person could work as a dishwasher. (Id.) But according to the VE, adding the likelihood that the person would miss work three days a month precluded any work. (Id. at 65.)

The ALJ turned questioning over to Hernandez's attorney, who asked about the educational development levels associated with the relevant entry for a dishwasher in the Dictionary of Occupational Titles ("DOT"). (Id.) The VE cited DOT number 318.687-010, which corresponds to the position of "kitchen helper." (Id.) The VE explained that this entry carries a level two reasoning requirement and a level one language requirement, which translates to reading between the first- and third-grade levels and is the lowest reading level the DOT acknowledges. (Id. at 65-66.) When pressed on the issue, the VE testified that he had performed the dishwasher job as part of his professional experience and could vouch for the fact that the job requires no actual reading. (Id. at 66.) The VE said he was not sure whether that testimony actually contradicts the DOT, because the lowest language requirement the DOT acknowledges is one. (Id. at 67.)

**D.     The ALJ's Decision**

After hearing the proffered evidence, the ALJ concluded that Hernandez is not disabled within the meaning of the Social Security Act. (A.R. 29.) In applying the standard five-step sequence for assessing disability, *see Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012), the ALJ found at steps one and two that Hernandez has not engaged in substantial gainful activity since January 1, 2007, and that she suffers from severe impairments including borderline intellectual functioning, depression, and anxiety, (A.R. 23). At step three the ALJ determined that none of Hernandez's impairments meet or equal a listing, and, after applying the special technique for analyzing mental impairments, concluded that her depression and

anxiety are not presumptively disabling. (Id. at 24-25.) In support of that conclusion, the ALJ found that Hernandez has only mild restrictions in activities of daily living and moderate restrictions in social functioning and maintaining concentration, persistence, or pace. (Id. at 24.) In particular, the ALJ characterized her as having a moderate limitation in the ability to maintain the concentration "necessary to understand, remember and carry out detailed instructions." (Id.)

Before turning to step four, the ALJ considered Hernandez's RFC, and concluded that she can perform a full range of work at all exertional levels but has several nonexertional limitations. (Id. at 25.) Specifically, the ALJ found that Hernandez is limited to "performing simple, repetitive, routine tasks in a work environment free of fast-paced production requirements and few, if any, changes in the work setting." (Id.) She is also limited, according to the ALJ, to simple decision-making, tasks that require only occasional contact with supervisors, co-workers, and the public, and jobs that require no more than a first-grade reading ability. (Id.) In explaining her RFC assessment the ALJ wrote that she found Hernandez's description of her symptoms "not credible" and noted that none of her treating physicians had opined that she has greater limitations than those the ALJ assigned. (Id. at 28.)

Turning to step four, the ALJ concluded that Hernandez's RFC leaves her able to perform her past relevant work as a dishwasher. (Id.) The ALJ pointed specifically to the VE's testimony in support of this conclusion and wrote that the evidence he provided "is consistent with the information contained in the" DOT.

9

(Id.) Having found that Hernandez is able to perform her past relevant work, the ALJ concluded that she is not disabled and denied her applications for benefits. (Id. at 29.)

**Analysis**

In moving for summary judgment Hernandez argues that the ALJ committed reversible errors in assessing her credibility, evaluating the medical record, and failing to resolve what she views as conflicts between the VE's testimony and the DOT. This court reviews the ALJ's decision to ensure that it is free of legal error and supported by substantial evidence, *see* 42 U.S.C. § 405(g), meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[,]" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted). This court's role is not "to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses." *Beardsley v. Colvin*, 758 F.3d 834, 836-37 (7th Cir. 2014). Rather, the court will defer to the ALJ's resolution of conflicts, *id.* at 837, asking only whether the ALJ built a "logical bridge" between the evidence and that resolution, *see Moon v. Colvin*, No. 13-3636, __ F.3d __, 2014 WL 3956762, at *2 (7th Cir. Aug. 14, 2014).

**A.     Credibility Assessment**

Hernandez's challenge to the ALJ's credibility analysis is a good place to start, because an "erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *See Pierce v. Colvin*, 739 F.3d 1046, 1051

(7th Cir. 2014); *see also Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011) (noting that an inadequate credibility determination is "reason enough" to reverse an ALJ's decision). This court applies particular deference to the ALJ's credibility determination, asking whether under a common sense reading that aspect of the decision is "patently wrong." *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). A credibility determination is patently wrong where it "lacks any explanation or support," *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008), or where it is marred by "fatal gaps or contradictions," *see Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010) (quotation omitted).

Here the ALJ's analysis of Hernandez's credibility begins with the oft-used bit of boilerplate language stating that a "claimant's statements concerning the intensity, persistence and limiting effects" of her symptoms "are not credible to the extent they are inconsistent with the above" RFC. (A.R. 28.) Beginning with *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012), which issued just one month after the ALJ's decision here, the Seventh Circuit has built a body of precedent describing this precise language as "get[ting] things backwards," *id.*, "hackneyed," *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012), and "pernicious," *Browning v. Colvin*, No. 13-3836, __ F.3d __, 2014 WL 4370648, at *5 (7th Cir. Sept. 4, 2014). The language is problematic because it implies that the RFC assessment "precedes and may invalidate the claimant's testimony about his or her ability to work" when "that testimony should be an input into a determination of ability to work." *Goins v. Colvin*, No. 13-3729, __ F.3d __, 2014 WL 4073108, at *4 (7th Cir. Aug. 19, 2014).

11

Nevertheless, an ALJ's use of this language does not mean the ALJ's conclusion is patently wrong where the ALJ otherwise gives supported reasons for discounting the claimant's credibility. *Schomas*, 732 F.3d at 708. Because here the ALJ gave several reasons to explain the credibility finding, the presence of the backwards boilerplate alone does not amount to reversible error. *See id.*

Unfortunately, the remainder of the reasons the ALJ gave for discounting Hernandez's credibility also bear many of the hallmarks of template language, in that they amount to nothing more than a generic list of general reasons that are almost entirely untethered to any record evidence. First, the ALJ writes that Hernandez "may have some depression but medical records show that it has improved with prescribed treatment." (A.R. 28.) The fact that the ALJ characterized Hernandez as someone who "may" have depression is concerning in itself because every single psychologist or doctor who evaluated Hernandez said that she *is* depressed. (See, e.g., id. at 320-21, 359, 372, 382.) More troubling still is that the ALJ's statement is wholly unsupported by citation to any record evidence, so there is no way for the court to track which medical records the ALJ was referencing in characterizing her condition as improving. (Id. at 28.) Although in April 2011 Fields noted that Hernandez's depression had improved on Prozac, a month later Dr. Fraum referred her to in-patient treatment because she was passively suicidal. (Id. at 362, 374-75.) And although Dr. Fraum's final report noted that Hernandez's mood was "better," (id. at 376), the rest of her notes show that Hernandez was still having bad days while taking Prozac, Klonopin, and

Abilify, (id. at 355-56). The ALJ's blanket statement that Hernandez "improved with treatment" fails to recognize that one or two notes reporting improvement may be nothing more than a reflection that a person suffering from depression is likely to have symptoms that "wax and wane," and even under continuous treatment "'is likely to have better days and worse days.'" *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (quoting *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008)); *see also Punzio v. Astrue*, 630 F.3d at 710 ("[A] person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition."). Because the ALJ's characterization is unsupported by any explanation or record citation, the requisite logical bridge between the evidence and the ALJ's conclusion is lacking.

The ALJ's second reason for discounting Hernandez's testimony is another conclusory statement: "any treatment the claimant has received for her alleged impairments has been essentially routine and/or conservative in nature, and not generally the type of medical treatment one would expect for a totally disabled individual." (A.R. 28.) Again, the ALJ does not offer any further explanation or cite any evidence to illustrate what she considers routine treatment. (Id.) Although it is true that conservative or routine treatment may cast doubt on a claimant's description of disabling symptoms, here the ALJ has not explained why she considers Hernandez's course of treatment conservative when it has included in-patient care and long-term prescriptions for Lexapro, Prozac, Abilify, and other medications. In the second-to-last treatment note on record, Dr. Fraum noted that

13

she needed to increase Hernandez's Prozac prescription to better treat her symptoms. (Id. at 377.) Because the ALJ did not explain her statement that Hernandez's treatment is conservative, the court has no way to gauge what sort of treatment the ALJ would expect someone with disabling depression to undergo. Once again there is no path of logic for the court to trace.

Next the ALJ writes, again without explanation, that Hernandez "has described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms." (Id. at 28.) This one is a head-scratcher. Hernandez described performing almost no daily activities at all and relying on her sister to take care of her children and household. (Id. at 55-56.) She said that she routinely spends her days in bed crying. (Id. at 49-50.) She does not have friends, she avoids leaving the house, and she does not finish household tasks even when she tries to perform them. (Id. at 57-58.) It is hard to imagine how Hernandez could have described more limited daily activities. Because the ALJ has not made any attempt "to explore the supposed contradictions here," the reference to Hernandez's daily activities "do not provide a sound basis for concluding that [her] report was inaccurate." *See Beardsley*, 758 F.3d at 838.

The ALJ's final reason does reference the record, although in a way that mischaracterizes the evidence. The ALJ wrote that "the record reflects work activity after the alleged onset date," which was earlier referenced as January 1, 2007, and said that even if that post-onset work was not substantial, "it does indicate that the claimant's daily activities have been, at least at times, somewhat

14

greater than the claimant has generally reported." (A.R. 23, 28.) As an initial matter, the ALJ cited the wrong disability onset date. Hernandez explicitly informed the ALJ in her brief and at the hearing that she was amending the onset date to December 31, 2009. (Id. at 39, 248.) Thus to the extent the ALJ was referencing work Hernandez performed from 2007 to 2009, (id. at 23), that work preceded the onset date of her claimed disability. Besides this mischaracterization of the record, to the extent the ALJ is referencing Hernandez's failed attempts at employment at a gym in 2010 and as a temporary worker in a factory in 2011, she did not address Hernandez's testimony that she was fired from both jobs for excessive absenteeism and that she performed them on a short-lived or part-time basis. (Id. at 47-48); *see Jelinek v. Astrue*, 662 F.3d 805, 812-13 (7th Cir. 2011) (reversing where ALJ failed to "ask the critical questions about Jelinek's actual work hours or absentee rates in the jobs she held"). The fact that a claimant works, especially where that work is part time, "is not a sufficient ground for concluding that she's not disabled." *Goins*, 2014 WL 4073108, at *2; *see also Pierce*, 739 F.3d at 1051 (reversing where ALJ discounted claimant's credibility based in part on unsuccessful attempt to work at capacity beyond RFC). Because the ALJ's reason is so terse, the court has no way of knowing how she reconciled Hernandez's inability to maintain her prior jobs with the idea that those work attempts—which she described at the hearing—show that her daily activities were somehow greater than she reported. (A.R. 28.)

Although the court is mindful of the need to give substantial deference to an ALJ's credibility decision, it also must hold the ALJ to the "basic obligation to develop a full and fair record" and to "build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *See Beardsley*, 758 F.3d at 837. The court is not obliged to "scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision." *See Moon*, __ F.3d __, 2014 WL 3956762, at *2. Because the paragraph the ALJ devoted to assessing Hernandez's credibility consists of a list of generic statements untethered to any evidence or analysis, it does not lend itself to meaningful judicial review. Accordingly, the case must be remanded for the ALJ to reassess Hernandez's credibility.

**B.  The ALJ's Consideration of the Medical Evidence**

Next Hernandez argues that the ALJ committed reversible error in explaining the RFC by focusing on facts that supported her conclusion to the exclusion of evidence that favors Hernandez's claim. As Hernandez points out, an ALJ may not "cherry-pick" evidence that supports her RFC conclusions while ignoring whole lines of evidence that support the claimant's allegations. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). That kind of "'sound bite' approach to record evaluation is an impermissible methodology for evaluating the evidence." *Scrogham v. Colvin*, No. 13-3601, __ F.3d __, 2014 WL 4211051, at *10 (7th Cir. Aug. 27, 2014). At the same time, an ALJ is not required to provide "a complete written evaluation of every piece of evidence" in order to adequately discuss the

RFC. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). Accordingly, the question becomes where on the spectrum, from "sound bite" to "complete written evaluation," the ALJ's discussion falls here, and whether that position shows that she adequately considered the relevant evidence.

Hernandez's argument is premised in particular on her dissatisfaction with the ALJ's discussion of Dr. Fraum's treatment notes and Dr. Kuntner's psychological evaluation. Although the ALJ gave an overview of the relevant notes and reports in summarizing the medical record, Hernandez faults the ALJ for failing to mention specific details from those documents that are favorable to her claim. For example, she highlights the ALJ's failure to extract certain symptoms from Dr. Fraum's treatment notes, including her isolating behavior, crying spells, irritability, and lack of motivation. (R. 11, Pl.'s Mem. at 14.) Similarly, she argues that the ALJ cherry-picked milder symptoms in her discussion of Dr. Kuntner's report to the exclusion of her observation of Hernandez's depressed mood, anxiety, and self-esteem problems. (Id. at 15.) But Hernandez's argument amounts to a request to nit-pick the ALJ's decision rather than give it a commonsense reading. *See Jones*, 623 F.3d at 1160. The ALJ "is not required to discuss every snippet of information" that might support Hernandez's claim. *See Pepper*, 712 F.3d at 363. Here the ALJ described both Dr. Fraum's notes and Dr. Kuntner's, highlighting symptoms and diagnoses like her severe reading disorder, recurrent major depressive disorder, agoraphobia, and personality disorder. (A.R. 27-28.) Although her description of the details in those records could have been more thorough, this is

17

not a case where the ALJ omitted favorable evidence from her discussion in favor of wholly filtered evidence supporting her conclusion. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). Accordingly, Hernandez has not shown that the ALJ committed reversible error in evaluating the underlying medical record.

**C.    The ALJ's Step-Four Findings**

Finally, Hernandez argues that the ALJ improperly relied on the VE's testimony to conclude that she can return to her past relevant work as a dishwasher, without resolving what she describes as several conflicts between the VE's testimony and the DOT. Specifically, she argues that the VE cited the DOT number for the job of "kitchen helper" when describing her past work as a dishwasher. The DOT assigns to the kitchen helper position a first- to third-grade reading level and a reasoning level of two. (A.R. 65.) At the hearing, Hernandez's attorney questioned the VE on these points, raising the potential conflict between the hypothetical posed by the ALJ and the kitchen helper's reading and reasoning requirements. (Id. at 66-67.) At the end of their discussion the VE conceded that "I'm not sure if I'm actually contradicting the DOT here or not." (Id. at 67.) But in her decision, the ALJ wrote only that, "[p]ursuant to SSR 00-4p, the evidence provided by the vocational expert is consistent with the information contained in the" DOT. (Id. at 28.)

Social Security Ruling 00-4p makes clear that an ALJ is required to ask the VE whether his testimony conflicts with the DOT, and if it does, to resolve the discrepancy before relying on one or the other. *See* SSR 00-4p, 2000 WL 1898704, at

*2 (Dec. 4, 2000); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). Those steps are necessary to ensure that the ALJ relies on VE testimony only to the extent that it is reliable. *See Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008). "Neither the DOT nor the VE . . . evidence automatically 'trumps' when there is a conflict." SSR 00-4p, 2014 WL 1898704, at *2. Accordingly, where "the basis of the vocational expert's conclusions is questioned at the hearing" the ALJ is required to ask whether the underpinnings of the VE's conclusions are reliable and to explain how any identified conflict between those conclusions and the DOT was resolved. *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) (emphasis omitted).

Here, the government appears to concede that the ALJ ignored the potential conflict Hernandez's attorney raised during the hearing, but presents a host of arguments as to why the ALJ properly prioritized the VE's evidence over the DOT. For example, it argues that the VE explained that in his professional experience the dishwasher job is generally performed with no reading rather than the first- to third-grade reading level cited in the DOT, that the hypothetical limiting Hernandez to simple, routine tasks is actually consistent with reasoning level two, and that the VE's testimony was reliable because he heard Hernandez describe all of her limitations before concluding that her RFC is consistent with the dishwasher job. (See R. 25, Def.'s Resp. at 8-9.) The problem with these arguments is that not a single reason the government points to here can be found in the ALJ's cursory discussion of the issue. (See A.R. 28.) As the Seventh Circuit has consistently and emphatically explained, the government may not defend the ALJ's decision on

19

grounds that the ALJ did not actually rely on in rendering her decision. *See Hanson v. Colvin*, No. 13-3473, __ F.3d __, 2014 WL 3732910, at *3 (7th Cir. July 30, 2014) (collecting cases). The government has not argued that the ALJ's failure to resolve the cited conflict between the VE's description of the dishwasher position and the DOT title is harmless, and the court has no way of knowing whether or why the ALJ would embrace the VE's version if she overtly grappled with it. *See Donahue*, 279 F.3d at 445 (recognizing that conflict between DOT reading requirements and VE testimony "is not so easy to deal with"). Accordingly, on remand the ALJ should specifically address the cited conflict between the VE's testimony and the DOT. *See* SSR 00-4p, 2000 WL 1898704, at *2.

## Conclusion

For the foregoing reasons, Hernandez's motion for summary judgment is granted, the Commissioner's is denied, and the case is remanded for further proceedings consistent with this opinion.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**